**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL T. MURRAY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 11-446** |
| | ) | **Electronic Filing** |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

## I.    INTRODUCTION

Plaintiff Michael T. Murray ("Murray") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("Act") [42 U.S.C. §§ 401-433, 1381-1383f].  The parties have filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, and the record has been developed at the administrative level.  For the reasons that follow, Murray's motion for summary judgment (*ECF No. 9*) will be granted, the Commissioner's motion for summary judgment (*ECF No. 11*) will be denied, and the Commissioner's decision denying Murray's applications for DIB and SSI benefits will be reversed.

## II.    PROCEDURAL HISTORY

Murray protectively applied for DIB and SSI benefits on November 27, 2007, alleging that he had become "disabled" on April 1, 1996.  R. 128, 131, 152.  The Pennsylvania Bureau of

1

Disability Determination denied the applications on September 19, 2008. R. 89, 95, 100, 106. Murray responded on September 25, 2008, by filing a timely request for an administrative hearing. R. 111-113. On January 19, 2010, a hearing was held before Administrative Law Judge Guy Koster (the "ALJ"). R. 28. Before testimony was taken, Murray amended his alleged onset date to August 27, 2007. R. 30. Murray, who was represented by counsel, testified about his impairments and concomitant limitations. R. 31-53. Mary Beth Kopar ("Kopar"), an impartial vocational expert, also testified at the hearing. R. 53-56. In a decision dated May 26, 2010, the ALJ determined that Murray was not "disabled" within the meaning of the Act. R. 9-21.

On July 20, 2010, Murray sought administrative review of the ALJ's decision by filing a timely request for review with the Appeals Council. R. 6-7. The Appeals Council denied the request for review on February 7, 2011, thereby making the ALJ's decision the final decision of the Commissioner in this case. R. 1. Murray commenced this action on April 1, 2011, seeking judicial review of the Commissioner's decision. ECF Nos. 1-3. Murray and the Commissioner filed motions for summary judgment on September 7, 2011, and October 7, 2011, respectively. ECF Nos. 9 & 11. These motions are the subject of this memorandum opinion.

## III. STANDARD OF REVIEW

This Court's review is plenary with respect to all questions of law. *Schaudeck v. Commissioner of Social Security Administration*, 181 F.3d 429, 431 (3d Cir. 1999). With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)(internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate

explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively-delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process by stating as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)(footnotes omitted). Factual findings pertaining to all steps of the sequential evaluation process are subject to judicial review under the "substantial evidence" standard. *McCrea v. Commissioner of Social Security*, 370 F.3d 357, 360-361 (3d Cir. 2004).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67

S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision. *Cefalu v. Barnhart*, 387 F.Supp.2d 486, 491 (W.D.Pa. 2005).

## IV.    THE ALJ'S DECISION

In his decision, the ALJ determined that Murray had not engaged in substantial gainful activity subsequent to his amended onset date. R. 14. Murray was found to be suffering from a history of bilateral hip replacement for avascular necrosis, degenerative disc disease (with a history of lumbar laminectomy), morbid obesity, depressive disorder, obstructive sleep apnea, herpetic keratitis (with a history of eye infections), and hypertension. R. 14-15. Although his hypertension was deemed to be "non-severe," his remaining impairments were deemed to be "severe" under the Commissioner's regulations. R. 14-15; 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c). The ALJ concluded that these impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 15-16.

In accordance with 20 C.F.R. §§ 404.1545 and 416.945, the ALJ assessed Murray's "residual functional capacity"[1] as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he requires a sit-stand option, he can only occasionally stoop and kneel, he cannot climb, and he is limited to simple repetitive tasks in a setting with few or no changes.

R. 16. Murray had "past relevant work"[2] experience as a bus driver, delivery driver, dispatcher, yard worker and billing clerk. R. 54-55. Kopar testified that an individual with Murray's limitations could not perform the duties of those jobs. R. 55. Therefore, it was determined that Murray could not return to his past relevant work. R. 19.

Murray was born on June 11, 1963, making him forty-four years old on his amended onset date and forty-six years old on the date of the ALJ's decision. R. 20, 32. He had more than a high school education[3] and an ability to communicate in English. R. 20, 32, 155, 161; 20 C.F.R. §§ 404.1564(b)(4)-(5), 416.964(b)(4)-(5). Given the applicable residual functional capacity and vocational assessments, the ALJ concluded that Murray could work as a toll collector, a ticket seller, or an information clerk. R. 20-21. Kopar's testimony established that

---

[1] The term "residual functional capacity" is defined as "that which an individual is still able to do despite the limitations caused by his or her impairments." *Hartranft v. Apfel*, 181 F.3d 358, 359, n. 1 (3d Cir. 1999)(parentheses omitted), citing 20 C.F.R. § 404.1545(a). The same residual functional capacity assessment is used at the fourth and fifth steps of the sequential evaluation process. 20 C.F.R. §§ 404.1545(a)(5)(i)-(ii), 416.945(a)(5)(i)-(ii).

[2] "Past relevant work" is defined as "substantial gainful activity" performed by a claimant within the last fifteen years that lasted long enough for him or her to learn how to do it. 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). The Commissioner has promulgated comprehensive regulations governing the determination as to whether a claimant's work activity constitutes "substantial gainful activity." 20 C.F.R. §§ 404.1571-404.1576, 416.971-416.976.

[3] Murray testified that he had completed two years of college in June 1987. R. 32.

these jobs existed in the national economy for purposes of 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).[4]  R. 55.

## V.    MEDICAL EVIDENCE

Murray worked as a delivery driver for several different employers between 1992 and 2006.  R. 157.  He was unable to continue working in that capacity because of his inability to lift or carry items that he was expected to deliver.  R. 33-41.  On July 5, 2007, Murray started working as a bus driver for a transit company.  R. 157.  During the ensuing two months, he missed approximately five days of work because of his eye, leg and back impairments.  R. 33, 156.  Murray, who was still a probationary employee at the time, was discharged on August 27, 2007.  R. 33, 156.  His amended onset date coincides with his termination.  R. 30.

On September 27, 2007, Murray sought treatment at the Jefferson Regional Medical Center ("Jefferson") after experiencing pain in his right foot.  R. 223.  He had apparently noticed the pain for the first time while cutting grass at his residence.  R. 223.  Although an x-ray of Murray's right foot revealed "no signs of bone infection or a fracture," it was determined that "significant arthritis" was present.  R. 224.  Murray was advised to keep his right foot elevated and apply ice on a periodic basis.  R. 224.

Murray returned to Jefferson on November 25, 2007, complaining of significant pain in his right groin.  R. 257.  He was unable to ambulate without using a cane.  R. 257.  After conducting a physical examination, Dr. Monica Chopra suspected that Murray was suffering from avascular necrosis in his right hip.  R. 258.  Dr. Richard Sullivan later examined Murray

---

[4] At the fifth step of the sequential evaluation process, "the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, [he or] she can perform work that exists in significant numbers in the regional or national economy." *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003).  This burden is commonly satisfied by means of vocational expert testimony.  *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005).

and found no palpable hernias.  R. 260.  Diagnostic imaging tests conducted on November 26, 2007, revealed that Murray had avascular necrosis in both of his hips.  R. 284, 292.

Dr. Robert F. Weiss, an orthopedic surgeon, examined Murray on February 5, 2008.  R. 289.  Murray complained of bilateral hip pain and difficulty ambulating.  R. 289.  Dr. Weiss recommended that Murray have his right hip surgically replaced.  R. 289.  Dr. Natalie Furlong was asked to clear Murray for the surgery and provide postoperative supervision.  R. 289.

Murray's right hip was surgically replaced on March 10, 2008.  R. 304-309, 314-316.  The operation was performed at Jefferson by Dr. Weiss.  R. 304, 314.  During a follow-up examination conducted on April 22, 2008, Murray reported "gradual improvement."  R. 366.  Nevertheless, he still required a cane for ambulation because of pain in his left hip.  R. 366.  Murray was instructed to undergo physical therapy to develop his artificial right hip and schedule surgery to replace his left hip.  R. 366.  As of May 27, 2008, Murray was still experiencing "worsening pain" in his left hip.  R. 608.

Dr. Weiss surgically replaced Murray's left hip on June 9, 2008.  R. 385-386.  The staples in Murray's incision were removed on June 24, 2008.  R. 607.  He was instructed to undergo physical therapy and return in four weeks for a follow-up examination.  R. 607.  On July 22, 2008, Murray reported "gradual improvement" and indicated that gentle range-of-motion testing on his left hip had been "painless."  R. 624.

Murray returned to Jefferson on July 11, 2008, complaining of severe diarrhea.  R. 729.  The diarrhea was accompanied by "clinical dehydration."  R. 724.  During a physical examination, Dr. Furlong observed that Murray's bowel sounds were "hyperactive."  R. 730.  An electrocardiogram revealed that Murray was suffering from "sinus tachycardia."  R. 731.  Murray

was discharged on July 13, 2008, and instructed to seek follow-up care with Dr. Furlong.  R. 724-725.

Dr. Weiss examined Murray on September 2, 2008.  R. 689.  Although Murray continued to "report stiffness" in his hips, he denied that he was experiencing pain.  R. 689.  X-rays taken on that occasion showed "satisfactory component alignment."  R. 689.

On November 6, 2008, Murray was admitted to Jefferson because of nausea, vomiting and diarrhea.  R. 718.  Dr. Brian J. Deyarmin opined that Murray was suffering from clostridium difficile colitis.  R. 719.  After undergoing inpatient treatment for the condition, Murray was discharged on November 8, 2008.  R. 716.  Dr. Michael McGonigal noted at the time of discharge that while Murray was still complaining of "loose stools," he was "not experiencing any further nausea or vomiting."  R. 716.

Murray returned to Dr. Weiss' office on March 3, 2009, complaining of occasional "tingling and numbness of the thighs."  R. 688.  Dr. Rajesh Mehta examined Murray on March 7, 2009.  R. 659.  In a letter to Dr. Weiss dated March 9, 2009, Dr. Mehta stated that Murray's symptoms were most acute when he was "standing, walking and bending," and that they were not as severe when he was "resting and lying down."  R. 659.  A magnetic resonance imaging ("MRI") scan performed on March 23, 2009, indicated that Murray's pain was attributable to "[l]ower lumbar epidural lipomatosis."  R. 687.

Murray was examined by Dr. Eric C. Chamberlain on April 22, 2009.  R. 685.  In the portion of his examination report describing Murray's subjective complaints, Dr. Chamberlain made the following observations:

> He says that anytime he stands or walks for more than about five minutes, he gets this pain.  He says that sometimes the pain gets bad enough and it makes him sweat and he needs to sit down.  He has had bilateral total hip arthroplasties from

Dr. Weiss and he has done relatively well from those. He has tried some physical therapy for this and it did not help.

R. 685. An epidural injection was administered on that occasion. R. 685. Dr. Chamberlain advised that a laminectomy would be considered if the injection did not alleviate Murray's pain. R. 685.

Studies conducted at Jefferson on April 19, 2009, and April 20, 2009, revealed that Murray had a very severe form of obstructive sleep apnea. R. 674-675. Meanwhile, Murray continued to experience back pain. He told Dr. Chamberlain on May 15, 2009, that the epidural injection had not provided him with lasting relief. R. 684. Acting on the recommendation of Dr. Chamberlain, Murray underwent a laminectomy on September 15, 2009. R. 713-715. The operation was performed at Jefferson by Dr. Chamberlain. R. 713-715. Murray was discharged on September 23, 2009. R. 697.

Murray saw Dr. Chamberlain for a follow-up appointment on October 9, 2009. R. 682. After examining Murray, Dr. Chamberlain noted that the surgical incision appeared to be "nicely healed." R. 682. He further observed that the "severe pain" that Murray had experienced prior to the surgery was "just about gone." R. 682. Dr. Chamberlain instructed Murray to begin a physical therapy program. R. 682.

## VI.    DISCUSSION

Murray challenges the ALJ's evaluation of both his mental and physical impairments. He argues that the ALJ erred by crediting the opinion of a consultative examiner over that of his treating psychiatrist in determining that he was mentally capable of maintaining a job. ECF No. 10 at 4-7. He further contends that the ALJ's findings concerning his physical capabilities are

not supported by "substantial evidence."  *Id.* at 7-11.  These issues will be addressed in sequential order.

Dr. Rolf G. Jacob, Murray's treating psychiatrist, indicated on May 7, 2008, that Murray had a "poor" ability to interact appropriately with supervisors, deal with work-related stress, maintain attention and concentration, behave in an emotionally stable manner, or demonstrate reliability.  R. 367-368.  On October 28, 2009, Dr. Jacob opined that Murray had a "poor" ability to follow work rules, deal with members of the general public, interact appropriately with supervisors, maintain attention and concentration, behave in an emotionally stable manner, demonstrate reliability, or understand, remember and carry out detailed or complex instructions.  R. 690-691.  At the hearing, Murray testified that he suffered from clinical depression and occasional panic attacks.  R. 46-47.  He stated that his depression had sometimes caused him to remain in his apartment for two weeks at a time.  R. 46.  When asked about his treatment regimen, Murray testified that he saw Dr. Jacob roughly four times per year.  R. 48.

Dr. Frank Mrus performed a consultative psychological evaluation of Murray on July 22, 2008.  R. 616-623.  After completing the evaluation, Dr. Mrus reported that Murray was "moderately" limited in his ability to respond appropriately to work pressures and changes in usual and routine work settings and "slightly" to "moderately" limited in his ability to understand, remember and carry out detailed instructions.  R. 622.  Murray's prognosis was described as "guarded."  R. 621.  Dr. John Rohar, a non-examining psychological consultant, opined on August 21, 2008, that Murray had no "marked" limitations.  R. 628-629.  Dr. Rohar indicated that Murray had only "moderate" mental limitations, and that he was "able to meet the basic mental demands of competitive work on a sustained basis."  R. 628-630, 641.

The ALJ accorded "great weight" to Dr. Mrus' examination findings and rejected the more severe limitations identified by Dr. Jacob. R. 19. He observed that Murray had been seeing Dr. Jacob for roughly twenty years, and that nothing in Dr. Jacob's treatment records suggested that Murray's depressive symptoms had worsened on or around the amended onset date. R. 19. The ALJ accounted for Dr. Mrus' examination findings by limiting Murray to a range of work involving only simple, repetitive tasks performed "in a setting with few or no changes." R. 16, 622.

An opinion expressed by a treating healthcare provider does not invariably control the determination as to whether a claimant has disabling functional limitations. *Brown v. Astrue*, 649 F.3d 193, 196, n. 2 (3d Cir. 2011). The assessment of a claimant's residual functional capacity is expressly reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). It was the prerogative of the ALJ to credit the opinion of Dr. Mrus over that of Dr. Jacob. *Diaz v. Commissioner of Social Security*, 577 F.3d 500, 505 (3d Cir. 2009)(explaining that an administrative law judge "is free to choose the medical opinion of one doctor over that of another"). In light of Dr. Mrus' conflicting assessment, the ALJ was not required to accept every limitation identified by Dr. Jacob. *Brown*, 649 F.3d at 196-197 (permitting an administrative law judge to credit the testimony of a medical expert over an opinion expressed by a claimant's treating psychiatrist). Murray's argument concerning the ALJ's evaluation of his mental impairments is without merit. ECF No. 10 at 4-7.

Murray contends that the ALJ erred in failing to credit his subjective complaints of disabling limitations stemming from his physical impairments. *Id.* at 7-11. At the hearing, Murray testified that he could not stand long enough to take a shower, and that he had been forced to shower while sitting on a "shower chair." R. 50. When asked whether an

accommodation permitting him to "alternate between sitting and standing" would alleviate his symptoms, Murray stated that he frequently reclined on a couch to "relax" his back and hips. R. 50-51. He explained that he had been unable to ambulate without using a walker for approximately fourteen to fifteen months, and that he had subsequently improved to the point at which he could walk with the assistance of a cane. R. 52. Kopar testified that no work existed in significant numbers in the national economy for an individual who needed to regularly elevate his or her legs in a reclining position during the course of an eight-hour workday. R. 56.

A claimant's subjective complaints of disabling symptoms must be given serious consideration whenever the record contains evidence of medically determinable impairments that could reasonably be expected to cause those symptoms. *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). The ALJ partially credited Murray's testimony by affording him a sit/stand option. R. 16. The only remaining question is whether the ALJ's residual functional capacity assessment adequately accounted for all of Murray's functional limitations. That question must be considered with reference to the medical opinions contained in the record.

Dr. James H. Letham, Murray's optometrist, reported on February 7, 2008, that Murray's eye impairment did not cause work-related limitations. R. 300-301. Dr. Letham specifically noted, however, that Murray's other treating physicians would be able to identify functional limitations resulting from other impairments. R. 301. Dr. Dilip S. Kar, a non-examining medical consultant, opined on September 12, 2008, that Murray could engage in "light"[5] work activities involving only occasional postural maneuvers. R. 644-650. In a letter dated May 26,

---

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b).

2009, Dr. Furlong stated that Murray's "multiple medical issues" had made it "impossible" for him to "maintain gainful employment." R. 651. On October 9, 2009, Dr. Chamberlain asserted that Murray's "multiple medical problems" had rendered him unable to work.[6] R. 683.

Dr. Furlong detailed Murray's physical limitations in a "medical source statement" dated October 30, 2009. R. 693-696. She indicated that Murray could "occasionally" lift or carry objects weighing up to twenty pounds and "frequently" lift or carry objects weighing "less than" ten pounds. R. 694. Dr. Furlong reported that Murray could stand or walk for "less than" two hours, and sit for "less than" six hours, during the course of an eight-hour workday. R. 694. She stated that he frequently experienced severe pain and fatigue, and that he needed to elevate his legs "[m]ost of the [t]ime." R. 694. Dr. Furlong further asserted that Murray could "never" climb, balance, crouch or crawl, that he had "limited" reaching, seeing and hearing abilities, and that he needed to avoid prolonged[7] exposure to poor ventilation, heights, temperature extremes, wetness, dust, fumes, odors and gases. R. 695. It was noted that Murray suffered from "chronic pain syndrome." R. 696.

In order for a claimant to be "disabled" within the meaning of the Act, both his or her medically determinable impairment (or combination of impairments) and his or her inability to

---

[6] Dr. Chamberlain later reiterated his opinion of disability in a separate letter dated September 13, 2010. R. 735. The letter was presented to the Appeals Council in support of Murray's request for review. R. 732-735. The Appeals Council ultimately denied the request for review, thereby making the ALJ's decision of May 26, 2010, the "final decision" of the Commissioner in this case. R. 1; *Sims v. Apfel*, 530 U.S. 103, 106-107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). The Court does not have jurisdiction to review the Appeals Council's decision denying Murray's request for review. *Bacon v. Sullivan*, 969 F.2d 1517, 1519-1524 (3d Cir. 1992). Since Dr. Chamberlain's second letter was never before the ALJ, it cannot be considered for the purpose of determining whether "substantial evidence" supports the ALJ's decision denying Murray's applications for DIB and SSI benefits. *Matthews v. Apfel*, 239 F.3d 589, 592-595 (3d Cir. 2001).
[7] Dr. Furlong did not specifically explain whether Murray needed to avoid "concentrated," "moderate" or "all" exposure to poor ventilation, heights, temperature extremes, wetness, dust, fumes, odors and gases. R. 695.

work must last (or be expected to last) for the statutory twelve-month period. *Barnhart v. Walton*, 535 U.S. 212, 214-222, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002). The ALJ rejected the limitations described in Dr. Furlong's "medical source statement" solely on the ground that those limitations had been identified just six weeks after Murray had undergone back surgery, and that he could not "project such severe limitations forward for twelve months or more." R. 18. The problem with the ALJ's analysis is that Murray's physical limitations predated his back surgery. The laminectomy was performed on September 15, 2009. R. 713-715. In a letter to Dr. Weiss dated March 9, 2009, Dr. Mehta stated that standing, walking or bending would cause Murray's symptoms to worsen, and that the symptoms would be "somewhat relieved" if he were to lie down and rest. R. 659. On March 26, 2009, Dr. Furlong declared that Murray's hip, back and sleeping impairments had rendered him incapable of maintaining a job. R. 651. Murray's back surgery was preceded by two hip replacements. R. 304-309, 314-316, 385-386. More than nineteen months elapsed between his first hip replacement and his laminectomy. R. 304-309, 314-316, 713-715. Murray testified that he had been discharged from his job as a bus driver on August 27, 2007, after missing five days of work because of leg and back impairments.[8] R. 33-34. His impairments did not suddenly appear during the fall of 2009, when Dr. Furlong completed her "medical source statement."

An administrative law judge may not reject competent medical evidence solely on the basis of "his or her own credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). The Commissioner points to nothing in the record which

---

[8] The inquiry required under the Social Security Act does not account for any "reasonable accommodations" mandated by Title I of the Americans with Disabilities Act of 1990 [42 U.S.C. §§ 12111-12117]. *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 803, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999); *Poulos v. Commissioner of Social Security*, 474 F.3d 88, 95 (3d Cir. 2007).

suggests that Murray's functional limitations were not sufficiently enduring to satisfy the Act's twelve-month durational requirement. ECF No. 12 at 15-18. The short interval between Murray's back surgery and the rendering of Dr. Furlong's opinion did not provide the ALJ with a legitimate basis for inferring that the limitations at issue had not lasted (or were not expected to last) for a full year. Furthermore, the ALJ completely ignored the environmental restrictions identified by Dr. Furlong. R. 18, 695.

The ALJ was not required to accept every functional limitation alleged by Murray. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). Nevertheless, he was not free to merely speculate that credibly established limitations would soon disappear. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)(explaining that an administrative law judge "may not make speculative inferences from medical reports" and "is not free to employ [his or] her expertise against that of a physician who presents competent medical evidence"). Since the ALJ clearly rejected Dr. Furlong's assessment for the "wrong reason," his decision denying Murray's applications for DIB and SSI benefits cannot stand. *Mason*, 994 F.2d at 1066.

It remains to be determined whether an immediate award of benefits is justified, or whether the appropriate remedy is a remand for further administrative proceedings. A judicially-ordered award of benefits is proper only where "the evidentiary record has been fully developed," and where "the evidence as a whole clearly points in favor of a finding that the claimant is statutorily disabled." *Ambrosini v. Astrue*, 727 F.Supp.2d 414, 432 (W.D.Pa. 2010). That standard is satisfied in this case.

Dr. Furlong found Murray to be incapable of performing even "sedentary"[9] work activities on a sustained basis. R. 694-695. Dr. Chamberlain similarly opined that Murray could not "maintain gainful employment." R. 683. Dr. Kar did not have access to the findings of Dr. Furlong and Dr. Chamberlain when he provided his consultative assessment. R. 644-650. Only Dr. Letham's opinion was known to him. R. 650. Dr. Letham did not contradict the opinions expressed by Murray's other treating physicians. Instead, he simply indicated that Murray's work-related limitations were not attributable to his eye impairment. R. 300-301. Dr. Kar's assessment did not provide the ALJ with a sufficient basis for rejecting the contrary opinions provided by Murray's treating physicians. *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 357 (3d Cir. 2008)(remarking that "a longtime treating physician's opinion carries greater weight than that of a non-examining consultant").

It is undisputed that Murray underwent two hip replacements and a laminectomy within the span of nineteen months. R. 304-309, 314-316, 385-386, 713-715. He testified that he frequently needed to lie down in order to alleviate the pain in his back and hips. R. 50-52. This testimony was consistent with the opinions expressed by Murray's treating physicians. R. 659, 694. No treating or examining physician rendered a contrary opinion. Kopar testified that no work existed in significant numbers in the national economy for an individual who needed to regularly elevate his or her legs in a reclining position. R. 56. Therefore, the Court will reverse the Commissioner's decision denying Murray's applications for benefits and remand the case solely for the purpose of calculating the amount of benefits owed to Murray.

---

[9] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.927(a).

## VII.    CONCLUSION

The Commissioner remains free to monitor Murray's condition for the purpose of evaluating his continued eligibility for benefits in accordance with the provisions of the Act and the applicable implementing regulations. *Newhouse v. Heckler*, 753 F.2d 283, 285-286 (3d Cir. 1985). In the meantime, however, he cannot deny benefits to Murray solely on the basis of the ALJ's "projection" that Murray's credibly established limitations were not likely to last long enough to satisfy the Act's twelve-month durational requirement. R. 18. At the time of the ALJ's decision, Murray's physical impairments and resulting limitations had already lasted for more than a year. Accordingly, the motion for summary judgment filed by Murray (*ECF No. 9*) will be granted, and the motion for summary judgment filed by the Commissioner (*ECF No. 11*) will be denied. The decision of the Commissioner will be reserved, and the case will be remanded to him solely for a calculation of the benefits to which Murray is entitled. An appropriate order will follow.


Date: April 27, 2012


                                                          s/ David Stewart Cercone
                                                          David Stewart Cercone
                                                          United States District Judge

cc:     Kelie Schneider, Esquire
        Christy Wiegand, AUSA


        (Via: CM/ECF Electronic Mail)